# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| SHEILA L. YOST, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 09-CV-3148-NKL ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

**ORDER**

Plaintiff Sheila Yost ("Yost") challenges the Social Security Commissioner's ("Commissioner") denial of her claim for disability insurance benefits and Supplemental Security Income under the Social Security Act ("the Act"), 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* Following an October 7, 2008 hearing, an Administrative Law Judge ("ALJ") found that Yost was not disabled. That decision of the ALJ stands as the final decision of the Commissioner. Yost seeks judicial review, petitioning for reversal of the ALJ's decision and an award of benefits or, in the alternative, remand. Because the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole, the Court denies Yost's petition.

**I.    Relevant Factual Background**[1]

Yost alleged an onset of disability beginning June 7, 2002, as a result of paranoid schizophrenia, psychotic disorder, bipolar, major depression, attention deficit hyperactivity disorder,

---

[1] Portions of the parties' briefs are adopted without quotation designated.

anxiety, adjustment reaction, post traumatic stress disorder, paranoia, borderline personality disorder and personality disorder, migraine headaches and deviated septum, status post surgery.

In 1998, Yost was treated for thoracic scoliosis and neuritis in her arms and hands. In 2001, she was treated for fatigue, depression and carpal tunnel syndrome.

Between 1999 and 2002, Yost was treated on several occasions for migraine and cluster headaches. In February 2002, she was hospitalized due to a cluster headache.

Yost was hospitalized for two days due to suicidal ideation in August 2002, reporting several suicide attempts that week and seeing things that were not there. She was discharged with a diagnosis of major depressive disorder, recurrent with psychotic features, a history of sexual abuse and migraine headaches. In December 2002, she was treated at a clinic for fatigue, lumbar pain, depression, migraine headaches, and possible bipolar disorder with suicidal thoughts, hearing voices and seeing shadows.

In November 2003, Yost saw Sharon Kelley, L.S.C.W., for counseling. At that time, Yost described a chaotic and physically, sexually, and emotionally abusive childhood. She was assessed with a Global Assessment of Functioning ("GAF") score of 31-40.[2]

---

[2] The GAF scale represents a clinician's judgment of an individual's overall level of functioning. It is rated with respect to psychological, social, and occupational functioning, and should not include physical or environmental limitations. A GAF score of between 31 and 40 denotes major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See* Diagnostic and Statistical Manual of Mental Disorders, 32, 34 (4th ed. text revised 2000) (DSM-IV-TR). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, shoplifting) or serious impairment of social or occupational functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficultly in social, occupation, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

In March and April 2004, Yost was hospitalized once for five days for wanting to kill her husband and herself. She believed her husband was hiding a woman in the walls of her home. She was discharged against medical advice with a diagnosis of delusional disorder, jealousy-type, major depressive disorder, history of sexual abuse, tobacco dependence, cannabis dependence, methamphetamine abuse and migraines.

In April through August 2004, Yost saw Thomas Zurkowski, M.D., three times. She was diagnosed with paranoid personality disorder and ADHD.

In June 2004, she was treated for a cluster migraine as well as vertigo.

In October 2004, Yost was examined as a disability claimant by Frances Anderson, Psy.D. Yost reported a long history of marijuana abuse, and using the substance once or twice a week. She indicated her vertigo was controlled with medication. Anderson opined that Yost could understand simple instructions and that her ability to sustain persistence, pace and concentration would appear to be adequate, as would her ability to adapt and to interact socially on a limited basis. Anderson diagnosed cannabis abuse, psychotic disorder, personality disorder not specified with borderline and dependent traits, migraine headaches, stress from unemployment, and a GAF of 55-60.

Also in October 20, 2004, Kenneth Bowles, Ph.D., a disability determination services consultant, reviewed Yost's records. His review echoed prior diagnoses. He stated that the evidence indicated Yost's alleged psychological limitations were partially credible, and that they would cause a mild to moderate degree of limitation in work activities. He stated she would be able to understand and remember simple instructions, sustain concentration, persistence and pace with simple tasks, and should have limited social contact.

In March 2005, Yost indicated her migraines were becoming more frequent and painful, and was sent to a hospital for an MRI. The MRI suggested a Chiari I malformation.[3]

In May 2005, Yost saw Michael Ball, D.O., for her headaches.

In a detailed July 9, 2005 Function Report, Yost indicated that she watered her garden, read, watched the news, and prepared meals. She indicated that when her health allowed, she worked on crafts. Yost had pets which she fed, watered, and bathed. She reported that she could not engage in activity for more than 30 to 40 minutes without getting dizzy, weak, or a headache. Yost prepared meals everyday, which took her forty-five minutes to one hour. She did laundry and also gardened in "short spurts." Yost left the house at least once or twice a day. She had someone drive for her because she never knew when she would "go blind." Yost reported migraine headaches with "spontaneous blindness and paralysis." She spent all day shopping once or twice a week. Yost's hobbies included television, painting, cow skulls, and swimming. She engaged in social activities once or twice a week including watching movies and attending a women's crafting group.

In August 2005, after several Imitrex injections, Yost was still having migraines after two weeks. She was sent to the hospital for an MRI. That month, she saw Dr. Ball for headaches and anxiety.

---

[3] A Chiari malformation, or Arnold-Chiari malformation, is "a congenital anomaly in which the cerebellum and medulla oblongata, which is elongated and flattened, protrude down into the spinal canal through the foramen magnum." *Dorland's Illustrated Medical Dictionary* 438 (27th ed.1988). "In Chiari malformation type I, signs and symptoms usually appear during late childhood or adulthood." MayoClinic.com, http:// www. mayoclinic. com/ health/ chiari-malformation/ DS00839/DSECTION=symptoms (Sept. 8, 2009). Common symptoms of Chiari I malformations include severe headaches, neck pain, unsteady gait, poor fine motor skills, numbness and tingling in hands and feet, dizziness, difficulty swallowing, vision problems, slurred speech. *Id.*

She was also treated at a clinic during that month, complaining of nausea, fatigue, light headedness, vertigo, vision problems, anxiety, and suicidal thoughts. She was assessed with Chiari malformation, muscle weakness and migraines.

In August 2005, Lester Bland, Ph.D., reviewed Yost's records as a disability services consultant and opined that her impairments of personality disorder and depression were non-severe. He stated these impairments would cause a mild degree of impairments for a variety of daily life activities.

In October 2005, her migraines were better with medication, but she reported hallucinations. She was diagnosed with schizoaffective disorder. At a follow-up appointment with Dr. Ball, he treated her for migraines with Topomax and Imitrex.

In November 2005, Yost again saw Sharon Kelley for counseling due to increased depression. She was disheveled and tearful, inaccurate on "serial sevens," and demonstrated impaired judgment and limited insight. Kelley assessed schizoaffective disorder with a GAF of 31-40.

Also in November 2005, Yost was seen at a clinic. She indicated she was doing better with her migraines, and that they were "very manageable" with medication.

In January 2006, three months after her third and last visit to him, Dr. Ball filled out a Medical Source Statement - Mental for Yost. He assessed moderate limitations in the areas of: understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual, completing a normal work week without interruption from psychological symptoms, and performing at consistent pace without rest periods.

5

In 2006, Yost was treated twice for different migraines. She was also treated for psychosis.

In May 2006, Yost was diagnosed with breast cancer. She had a lumpectomy and continued with radiation and chemotherapy over time.

Also in May 2006, Frances Anderson again examined Yost as a social security claimant. Yost told Anderson that she had not experienced episodes of mental illness "in quite a while," and was not attending regular psychological treatment. Yost reported daily activities such as gardening, watching movies, reading, crossword puzzles, preparing meals, doing laundry, house-cleaning, grocery shopping, and socializing. Anderson assessed cannabis abuse, psychotic disorder, provisional and personality disorder with borderline and dependent traits. Anderson assessed a GAF of 60 and stated that Yost was capable of simple instructions or tasks with limited social interaction.

In June 2006, Yost indicated that she had been diagnosed with breast cancer and was assessed with anxiety over treatment.

That month, Loretta Fuge, Psy.D., examined Yost as part of a Medicaid determination. Fuge administered personality testing. Fuge stated that Yost had a tendency to be reactive to stress, worry excessively, had depressive and anxiety symptoms, may have trouble concentrating, may be confused and becomes easily distracted. Fuge stated that Yost appeared to require continued treatment, but that she should have been able to return to work within four to six months if she fully engaged in therapy, took her medication, and followed treatment recommendations. Fuge opined that Yost "may be" exaggerating her symptoms in an effort to plea for help.

Yost reported her depression was better in July 2006. In September 2006, Yost felt her depression medications needed to be adjusted.

In a January 2007 progress report, Sharon Kelley indicated that Yost had attended only one therapy appointment between November 2005 and July 2006. Kelley noted that it was the second time that Yost had only attended one session and failed to return. She noted that Yost was noncompliant and poorly motivated for treatment in the past. Kelley also observed that Yost had a history of starting and stopping her medications as desired.

On a second Function Report dated February 2007, Yost wrote that her daily routine included getting up to make coffee for her husband, letting her dogs out, and tending to her rabbits. She indicated that when she had migraines or vertigo, she spent most of the day in bed and performed no chores

In March 2007, Marsha Toll, Psy.D., another disability determination consultant, reviewed Yost's records. Toll found impairments of schizoaffective disorder, depression and anxiety. Toll opined these would cause a moderate degree of difficulty with social functioning and a mild degree of difficulty maintaining concentration, persistence, or pace. Toll concluded Yost would be able to carry out simple instructions, and to sustain concentration, persistence and pace with simple tasks and limited social contact.

In June 2007, Yost reported that her bipolar disorder and depression had worsened with chemotherapy. She was assessed with bipolar disorder, severe depression and migraine headaches. A follow-up visit shortly thereafter addressed those issues. Yost had completed radiation and chemotherapy. She reported a diagnosis of septal deviation.

In July 2007, Yost was placed on a ninety-six hour "hold" at a hospital due to suicidal statements related to her worsening headaches. Yost reported using marijuana daily and a drug

screen was positive for marijuana. The discharge diagnosis was delusional disorder by history versus schizophrenia, acute stress disorder. She was assessed with a GAF score of 58.

Approximately a week later, she was seen at a clinic for migraines and scheduled for nasal septal reconstruction.

A 2007 chest x-ray showed mild degenerative disc disease of the thoracic spine.

In August 2007, Donald McGehee, Ed.D., examined Yost as part of a Medicaid determination process. He reported she appeared to be psychotic, exhibiting symptoms with evidence of hallucinations and delusions. A mood disorder questionnaire was positive for bipolar disorder. Test scores showed severe depression and marked potential for suicidal ideation. McGehee commented that a personality test suggested "negative impression management." Yost complained of having migraines ten times per month. McGehee assessed a current GAF of 31.

In February 2008, Yost reported new problems of neck pain, shoulder pain, and hip pain in addition to the bipolar disorder and migraines. She reported that the hip pain continued in March 2008 as well as in April 2008, when she also reported mild episodes of audio hallucinations. She was assessed with bipolar disorder and psychosis.

In August 2008, Dr. Zurkowski sent a letter to Yost's attorney, stating that she had been seen again four times since April 2008. It appears that these appointments were primarily for an arm injury. Yost was not in counseling at the time of her April appointment. Dr. Zurkowski stated that she was not consistent in her appointments such that he could evaluate her situation or abilities, though he did not see any mentally disabling factors at the time. Dr. Zurkowski stated that Yost should be able to lead a functional life if she was compliant with further medication and therapy.

In September 2008, McGehee completed a Medical Source Statement - Mental for Yost. He identified moderate limitations in memory, concentration and persistence, social interaction, and the ability to adapt. McGehee noted that he had only seen Yost once over a year before.

**A.     Yost's Testimony**

At the October 2008 hearing, Yost testified to the following. She was born in 1968, graduated from high school and has some college credits.

Yost testified about her migraines. She stated that she wore transitional glasses. The migraines could come on suddenly and last from five minutes to four hours. She had someone else drive her because the migraines could cause sudden vision loss. She had to give herself an Imitrex shot when a migraine comes on; even with the shot, she needs to lie down for four hours. She said the migraines were debilitating, causing her to be light and sound sensitive, and sometimes nauseated. She testified to two to three migraines per week.

She testified that her medications cause problems such as loss of balance, drowsiness, and short term memory loss. She said she had not used marijuana since February 2008.

Yost testified about her mental health issues. She stated that she lost her last job because of hallucinations. She quit nursing school because her medications and symptoms interfered. She believed her husband was hiding a woman under the porch of her house. She was paranoid and had anger issues. She said she had panic attacks twice a day and is very nervous. She testified to having suicidal thoughts. Her bipolar disorder caused her to be either depressed or manic. Yost said a friend checked on her to assure that she was taking her medications and taking care of herself.

Yost testified to hip pain. She said she had problems with sleep, and took a two hour nap during the day.

### B. Medical Expert Testimony

Thomas England, Ph.D., testified as a medical witness paid by the Commissioner. He testified that the record indicates that Yost had schizophrenic disorders, affective disorders, anxiety disorders, personality disorders, and substance addiction disorders which did not meet or equal a listed impairment. He said she would have mild limitation of daily activities, mild limitation of social functioning and mild to moderate limitation of concentration, persistence and pace and no periods of decompensation. He testified that in his experience, a lot of information in the medical records was obtained just through personal observations of demeanor, mannerisms and appearance. He also stated it was common for someone with the same diagnoses as Yost to have difficulties with compliance with medication based on perceptions of impairments, insight and judgment. Finally, England testified that medications taken by Yost typically cause over sedation, sleepiness, and occasional difficulties with concentration.

### C. Vocational Expert Testimony

A vocational expert ("VE") testified at the hearing. He said that a claimant with limitations as assessed by Dr. Ball or McGehee would not be able to sustain employment. The VE testified that a claimant like Yost in age, education and work history would not be able to perform her past work, but would be able to perform the jobs of general assembler and table worker with the following limitations: limited lifting, standing up to two hours, sitting six to eight hours, no hazards/climbing/exposure to heights or machinery, no environmental extremes, one to three step simple instructions, no public contact, limited co-worker and supervisor contact; no more than minimal use of judgment, and no more than minimal need to experience change. A claimant who

had to take a one-hour unscheduled break or be absent an average of two days per month would not be able to sustain competitive employment.

## II.     The ALJ's Decision

In her October 29, 2008, written decision, the ALJ set forth the requisite five-step process for making disability determinations. *See* 20 C.F.R. §§ 404.1520, 416.920, as well as the process for evaluating allegations of disabling mental impairments, *see* 20 C.F.R. 404.1520a and 416.920a. Applying that process, in relevant part, the ALJ found that Yost had the following severe impairments, which did not meet or equal the listed impairments: schizophrenic, paranoid or other psychotic disorder (multiple diagnoses, including delusional disorder and history of psychotic disorder); affective disorders (diagnoses of bipolar disorder and major depressive disorder); diagnosis of attention deficit hyperactivity disorder; anxiety related disorders (diagnoses of anxiety, not otherwise specified, adjustment reaction, rule out panic attacks and post traumatic stress disorder); personality disorder (diagnoses of paranoia, borderline personality disorder and personality disorder, not otherwise specified); polysubstance abuse; migraine headaches; and deviated septum, status post surgery.

The ALJ reviewed the medical evidence in detail. She noted records indicating that Yost's headaches are "very manageable" with medication. The ALJ also noted the conflicting reports concerning the frequency of the headaches. The ALJ gave little weight to the opinion of McGehee, because it was prepared after examining her, because he did not review her records, and because he did not take into account the possible "negative impression management" and substance abuse. The ALJ gave little weight to the opinion of Dr. Ball because he was not a mental health specialist and his conclusions were inconsistent with the overall record. The ALJ commented that Yost appeared

11

unwilling to comply with treatment, and emphasized Fuge's opinion that Yost could have been ready to work after four to six months if compliant – a period shorter than the one-year required for a determination of disability.

The ALJ concurred with England's opinion. The ALJ stated that she gave Yost the benefit of the doubt in imposing greater restrictions than those found by England. The ALJ also gave some weight to Anderson's opinion that Yost could do simple work with limited social interaction, though the ALJ did not accept Anderson's later opinion that Yost could handle detailed instructions. Given Dr. Zurkowski's letter to Yost's counsel, the ALJ declined to issue a subpoena for his records. While the ALJ found Yost to be more limited than did the non-examining consultants and non-physicians, the ALJ did consider them and stated that she considered the record as a whole.

Citing factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984), the ALJ reviewed Yost's subjective complaints. The ALJ found that Yost's testimony and allegations were not fully credible.

The ALJ found that Ms. Yost had the following residual functional capacity ("RFC"): able to lift and carry five pounds frequently and ten pounds occasionally; able to stand/walk two hours total during an eight hour workday; able to sit six to eight hours total during an eight hour workday; unable to perform work involving exposure to climbing of significant unprotected heights, exposure to potentially dangerous unguarded moving machinery or involving commercial driving; requires a climate controlled environment reasonably free of environmental irritants; limited to simple and repetitive work involving only one, two or three steps; no public contact, customer service and involves only minimal contact with co-workers and supervisors; no teamwork, but able to carry out work duties in proximity to co-workers and supervisors.

**III.    Discussion**

Yost argues that the ALJ erred in (1) failing to find that her Arnold-Chiari malformation was a separate severe impairment and (2) failing to give appropriate weight to the opinions of Dr. Ball and McGehee.  To establish entitlement to benefits, Yost must show that she was unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  *See* 42 U.S.C. §§ 423(d) and 1382c(a)(3)(A); *Barnhart v. Walton*, 535 U.S. 212, 216-20 (2002).

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole.  *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir.2007).  "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion."  *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007).  The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice."  *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir.2007).  "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact."  *Id.* (quoting Nicola, 480 F.3d at 886).

**A.    The ALJ Appropriately Considered Yost's Impairments**

Though the ALJ did not find Yost's Chiari malformation to be a separate severe impairment, the ALJ did fully find the symptoms arising from that malformation to be severe.  Essentially, all of the symptoms that Yost attributes to her Chiari malformation were related to her migraines.  In her decision, the ALJ discussed the fact that Yost attributed her headaches to the Chiari malformation.  The ALJ found that Yost's migraines and associated symptoms were severe impairments, discussing the migraines in detail.  Rather than ignoring Yost's Chiari malformation,

13

the ALJ simply discussed the limitations related to her Chiari malformation in terms of her resulting migraine headaches and associated visual changes. Yost does not point to any symptom of the Chiari malformation that any source found to limit Yost which the ALJ did not consider. The ALJ's decision to describe Yost's severe impairment as "migraines" rather than as a Chiari malformation resulting in migraines had no substantive effect on the ALJ's decision. *See Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (stating that ALJ's questions to VEs need not refer to impairments in diagnostic terms but, rather, should capture the concrete consequences of those impairments); *Roe v. Chater*, 92 F.3d 672, 676 (8th Cir. 1996) (stating that ALJs "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments"). Once the ALJ found

that Yost's migraines and associated symptoms were severe impairments, she properly evaluated the impact of those impairments.

### B. The ALJ Appropriately Considered the Medical Evidence

Yost argues that the ALJ should have given greater weight to the opinions of Dr. Ball and McGehee. Generally, ALJs will give a treating source's opinion on the nature and severity of impairments controlling weight if that opinion is well-supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2) (cited in *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004)). However, neither Dr. Ball nor McGehee need be considered a treating source entitled to controlling weight.

Dr. Ball's treatment of Yost does not indicate that his opinion had to be afforded controlling weight. He saw Yost only three times – between March and October of 2005. *See Randolph v.*

*Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (finding that a physician who saw a claimant only three times need not be afforded treating physician status). Ball is not a mental health specialist. *See* 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5) (stating that ALJs may consider a medical source's specialization in weighing medical opinions). His treatment assessed only headaches or migraine headaches, and his treatment notes do not describe the functional limitations listed on the Medical Source Statement-Mental form. *See* 20 C.F.R. §§ 404.1527(d)(3) and 416.927(d)(3) (supportability is a factor the ALJ may consider in evaluating medical opinions). Thus, while the ALJ did consider Dr. Ball's opinion, she did not err in limiting the weight she afforded it.

The ALJ was also not required to assign controlling weight to the opinion of McGehee, who was not a treating source and only examined Yost on one occasion in August 2007. It is well established that the opinion of a nontreating source is not entitled to significant weight. *See Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998). In addition, McGehee indicated that his test findings were of suspect reliability in suggesting negative impression management. Where he questioned his own findings, the ALJ was justified in affording his non-treating opinion little weight. *See* 20 C.F.R. §§ 404.1527(d)(3) and 416.927(d)(3) (concerning supportability).

In addition to their questionable validity, the opinions of Dr. Ball and McGehee were contradicted by several other medical sources. These include the opinion of Dr. Zurkowski, a treating source who saw Yost on several occasions shortly before her hearing, opining that she had no mental disability and could lead a functional life if she was compliant with treatment. The opinions of Dr. Ball and McGehee were also inconsistent with the opinion of England, who reviewed the evidence of record, as well as Anderson, who saw Yost on two occasions and opined that she could perform simple work with limited social interaction. It was the responsibility of the

15

ALJ to resolve conflicts among medical opinions. *See Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008). Her resolution is supported by substantial evidence.

**IV.    Conclusion**

Accordingly, it is hereby ORDERED that Yost's petition [Doc. # 3] is DENIED.

s/ NANETTE K. LAUGHREY
NANETTE K. LAUGHREY
United States District Judge

Dated: April 1, 2010
Jefferson City, Missouri